Jared A. Washkowitz  (7653)
JAW LEGAL
1050 Bishop Street #450
Honolulu, Hawaii 96813
Tel: 808-840-7410
Fax: 415-520-9729
Email: jwash@jawlegal.com

Douglas T. Moore
Law Offices of Douglas T. Moore LLC
Mililani Building
820 Mililani Street, Suite 701
Honolulu, Hawaii 96813
Tel: (808) 526-0056
Fax: (808) 526-0057
Email: DTMLawoffice@gmail.com

Attorneys for Plaintiffs
ELIZABETH WEBSTER and
ALEXANDER BURCKLE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIZABETH WEBSTER, an individual; and ALEXANDER BURCKLE, <br><br> Plaintiffs, <br> vs. <br><br> CLARK ENTERPRISES INC., dba SAIL MAUI, dba PARAGON SAILING CHARTERS MAUI, a domestic for-profit corporation; PATRICK LAUGHLIN, an individual; DOE DEFENDANTS 1-20, | CASE NO.: <br> (IN ADMIRALTY) <br><br> COMPLAINT; SUMMONS <br><br> DEMAND FOR JURY TRIAL |

-1-

| | |
|---|---|
| DOE CORPORATIONS, 1-20, DOE GOVERNMENT AGENCIES 1-20, DOE PARTNERSHIPS 1-20, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |
| _____ | ) |

# COMPLAINT

Plaintiffs ELIZABETH WEBSTER (herein "WEBSTER") and ALEXANDER BURCKLE (herein "BURCKLE)(collectively "Plaintiffs"), by and through their undersigned counsel, sets forth the following Complaint against Defendants CLARK ENTERPRISES INC., dba SAIL MAUI, dba PARAGON SAILING CHARTERS MAUI, a domestic for-profit corporation; PATRICK LAUGHLIN, an individual; DOE DEFENDANTS 1-20, DOE CORPORATIONS, 1-20, DOE GOVERNMENT AGENCIES 1-20, DOE PARTNERSHIPS 1-20, as follows:

## I.    Parties, Jurisdiction, and Venue

1.     This is a case of admiralty and maritime jurisdiction as more fully alleged herein and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.     Jurisdiction is based upon 28 U.S.C. § 1333 (admiralty) as this action is a claim for injuries sustained by a passenger aboard a vessel in navigation upon the navigable waters of the United States. This Court also has diversity jurisdiction

pursuant to 28 U.S.C. § 1331 because both Plaintiffs and all Defendants are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper in this district pursuant to 28 USC § 1391 because Defendants reside in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

3. Plaintiffs WEBSTER and BURCKLE are and were at all relevant times herein, a married couple who reside and are domiciled in Alameda County, California.

4. Upon information and belief, Defendant CLARK ENTERPRISES INC., dba SAIL MAUI, dba PARAGON SAILING CHARTERS MAUI (herein "SAIL MAUI") is and was all times relevant herein a domestic for-profit corporation domiciled in the State of Hawaii and registered to do business in the State of Hawaii for the purpose of operating snorkeling and sailing charters on the island of Maui.  At all times relevant herein, SAIL MAUI was the owner, operator, and/or charterer of the small passenger vessel ALIHILANI (O.N. 1231820) (herein "the Vessel").

5. Upon information and belief, Defendant PATRICK LAUGHLIN (herein "CAPT. LAUGHLIN") was and is an individual domiciled in the State of Hawaii. At all times relevant herein, LAUGHLIN was a United States Coast Guard licensed mariner and was employed by SAIL MAUI, and acted within the scope of his employment and duties as an employee of SAIL MAUI at all times herein.

6.  DOE DEFENDANTS 1 through 20, DOE CORPORATIONS 1 through 20, DOE GOVERNMENT AGENCIES 1-20, and DOE PARTNERSHIPS 1-20, are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiffs, except that they are persons and/or entities who are in some manner presently unknown to Plaintiffs engaged in the activities alleged herein; and/or are in some manner responsible for the injuries and damages to Plaintiffs; and/or are persons and/or entities who conducted some activity in a negligent and/or willful manner; which conduct was the proximate cause of the injuries or damages to Plaintiffs and/or were in some manner related to the previously named Defendants engaged in the activities alleged herein; and Plaintiffs pray leave to insert their true names and capacities, activities and/or responsibilities, whether individual or corporate, when the same are ascertained.  Plaintiffs have been unable to ascertain the identities of these DOE DEFENDANTS through a thorough examination of all documents available to Plaintiffs at this time.  SAIL MAUI, CAPT. LAUGHLIN and DOE DEFENDANTS may be collectively referred to herein as "Defendants".

## II.   General Allegations

7.  On or around September 23, 2021, Plaintiffs were visiting Maui on their honeymoon and purchased tickets to partcipate in Defendant's "Lanai Coast" snorkel

tour. The snorkel tour was scheduled to depart from Lahaina Harbor, Maui at 10:00 a.m. and return to Lahaina Harbor at 3:00 p.m. Plaintiffs are both chemists with graduate degrees from Standford University, are experienced snorkelers, and Plaintiff BURCKLE had been to Maui on numerous previous occasions.

8. At approximately 9:00 a.m. (all time estimates herein are approximations), Plaintiffs left the Sheraton Maui Resort in Kaanapali for Lahaina harbor. They arrived at 9:15 a.m. and checked in with a male crew member of SAIL MAUI for their tour.

9. At approximately 9:55am, the Plaintiffs and the other passengers (44 total passengers) were addressed at the end of the boat dock by CAPT. LAUGHLIN egarding boat practices. There were three additional crew onboard—a male crewmember, and two female crew members. The crew used a company provided, passenger manifest, via an electronic system on an iPad to ensure all passengers were present and accounted for prior to departure.

10. At approximately 10:00 a.m., Plaintiffs boarded the Vessel and sat on a mesh netting near the starboard bow by a family of three from Alabama with a young daughter and near a honeymooning couple from Alabama/Louisiana.

11. At approximately 10:05 a.m. , CAPT. LAUGHLIN made his way to the front of the boat and addressed the passengers and briefed them on the plan for the day

(sail 45 minutes to one hour toward Lanai), where to find food and beverages onboard, and that passengers should not be embarrassed about asking questions.

12. At approximately 10:30 a.m., snorkel equipment was passed out to the passengers by the female crew members. Plaintiffs brought their own fins, masks, and snorkels. Plaintiffs used the masks provided by SAIL MAUI, but kept their own snorkel and fins.

13. At approximately 10:40am the Vessel arrived at the snorkel location off shore of the abandoned Old Club Lanai. The male crew member entered the water to find a mooring anchor. He was unsuccessful, came back onboard, the boat advanced somewhat and another mooring spot was identified. The male crew member re-entered the water and was joined by the female crew member to tie down boat. The other female crew member remained onboard. All passenger belongings were placed below deck including phones, wallets, keys, and clothes. The only belongings left on deck were two clear beverage cups labeled with Plaintiffs' first names, which were secured into the netting on the side of the boat. There were no other boats moored in the area.

14. At approximately 10:45 a.m., CAPT. LAUGHLIN gathered all passengers at the bow of the Vessel for a safety briefing on hand signals for distress (waving of arms overhead) and "I'm okay" (knocking of hand on top of head). To the best of Plaintiffs' recollection, he mentioned the flotation devices that were available which

included a yellow floatation belt and foam noodles. He identifed the entry and exit points into and out of the water. He identified the snorkel location as Club Lanai and identified the abandoned Old Club Lanai on shore, which was approximately ½ mile away on the shore. He mentioned to swim north into the prevailing current and to then use the current to return back to the boat. He mentioned reefs and not wanting people to get cut up, but no snorkeling boundaries were provided to the passengers. CAPT. LAUGHLIN stated that they would be in this location for approximately one hour and then the Vessel would embark for the second (unspecified) snorkel location of the day, although no specific return time to the Vessel was provided.

15.  To the best of Plaintiffs' recollection, there was no mention by the Captain or crew at any time of the following: snorkeling boundaries; how to get back on the Vessel; the specific time to return to the Vessel; which crewmember was the designated lifeguard; how a rescue would work if one was necessary; use of the buddy system; what to do if caught in a strong current; or what to do in the case of an emergency besides just generally signaling distress.

16.  At approximately 10:50 a.m., all 44 passengers, including Plaintiffs entered the water. Plaintiffs entered the water by jumping off the port side of the boat with fins, mask, and snorkel. WEBSTER was wearing a swimsuit and long sleeve UPF shirt and BURCKLE was only wearing a swimsuit. The waters were clear, 20 ft

deep, and relatively calm. Plaintiffs swam north into the current as instructed for approximately 45-60 minutes maintaining about 20 ft. water depth.

17. Throughout the snorkeling excursion, the passengers from the Vessel were returning back to the vessel at different intervals, prior to the departure from the location. At approximately 11:50 a.m. Plaintiffs estimated they were in the water for an hour and were near the end of the time at this snorkel location. The water had become more turbulent with prevailing 2-4 foot waves.

18. At approximatley 12:05 p.m., after swimming for about 15 minutes in a direct line for the Vessel, Plaintiffs still had not made progress towards the boat. The water was choppy and Plaintiffs started swimming more aggressively towards the Vessel.

19. At approximately 12:20 p.m., after another 15 minutes (approx.) of aggressive swimming, the Vessel was clearly farther from Plaintiffs than it was at the last time they had checked. The water was now 30-40 feet deep. Plaintiffs now feared that they would not be able to return to the Vessel under their own power and Plaintiffs began signaling distress and calling for help in the direction of the Vessel.

20. At approximately 12:25 p.m., the in water lifeguard finished corralling what she erroneously thought was the last passenger back onboard the Vessel, and the crew prepared to depart for the next dive site. One passenger later reported to the

Coast Guard that when she returned to the Vessel, she reported to a crew member that Plaintiffs were still out in the water further out then where she had been, but the crew member assured her Plaintiffs were already accounted for. The first mate conducted approximately three head counts. The initial two head counts were conducted without the use of any additional equipment and he obtained a count of 42. During the third head count, the first mate utilized a clicker to track the onboard passengers, and reported a count of 44 all present and accounted for to the vessel captain. Other passengers later gave statements to the Coast Guard stating that the mate did not make people hold still or sit down during the head count, and that people were wandering around above and below deck during. At approximately 12:30 p.m., thinking that all passengers were aboard, the Vessel departed the mooring at Old Club Lanai enroute to Mala Wharf for their second snorkel site, leaving Plaintiffs behind in the open ocean.

21. Plaintiffs continued swimming with regular distress signaling towards the Vessel. The Vessel had become significantly farther away from Plaintiffs and because Plaintiffs were swimming toward the Vessel, they had been led into much deeper water (60-80 ft). Plaintiffs could see from the landmarks on shore that they we were in line with where the Vessel was when they initially entered the water.

22. At approximately 12:35 p.m. the ocean conditions had increased to what Plaintiffs estimate was 6-8 foot rolling surf. Plaintiffs were approximately ½ mile

from shore at this time with no visibility when in the trough of a wave. At the crest of a wave both Maui and Lanai were visible, however no boats in any direction could be seen. Plaintiffs were beginning to panic and were struggling to swim in the ocean conditions. They feared that drowning was imminent. Plaintiffs realized the Vessel had left them and was not coming back for them, and they decided that their only option for survival at that point was to return to shore. Plaintiffs were extremely fearful and nervous about the decision because they were told in the safety briefing explicitly not to swim to Lanai and that shallow reefs were in the area.

23. At approximately 12:40 p.m. Plaintiffs began swimming as hard as they could towards the shore of Lanai towards Old Club Lanai, using landmarks on shore to ensure a straight trajectory. The last 100-200 meters of the approach had low visibility- no greater than 4 feet from 100-200 meters out and no greater than 2 feet from within 100 meters. Tops of the reef were rocky and close to the surface of the water.

24. At approximately 1:00 p.m. Plaintiffs reached the shore of Old Club Lanai. Plaintiffs were fatigued and dehydrated. WEBSTER wrote 'HELP' and 'SOS' in the sand but no boats were visible from shore. A few minutes later a sailing catamaran with the name "TRILOGY" rounded the southern tip of visible shoreline. Plaintiffs called for help and tried to flag the boat

down by waving their swim fins and a large palm frond. The boat did not stop or offer assistance.

25. After about ten minutes on the beach a truck pulled up, honked and flashed its lights. The operators of the truck were RJ and Shra Sanches, residents of Lanai were driving through and noticed Plaintiff signaling for distress. They allowed Plaintiffs to use their phones and provided Plaintiffs with water.

26. At approximately 1:15 p.m. WEBSTER called SAIL MAUI on Shra's phone and told the woman on the phone that Plaintiffs had been abandoned by the snorkel charter with SAIL MAUI and that they could see the Trilogy boat. The person from SAIL MAUI asked what boat/ charter Plaintiffs were on and WEBSTER told her it was the one that left in the morning at 10:00 a.m. but she couldn't remember the name. SAIL MAUI asked for Plaintiffs reservation name and said she would call Plaintiffs back. It was apparent that SAIL MAUI did not realize at this point anyone was missing from the charter. After this call RJ informed Plaintiffs that should the boat return it would not be able to dock on the beach and that Plaintiffs would have to get back from Manele Bay Harbor on the other side of the island, and they kindly offered to drive Plaintiffs there.

27. Over the next hour or so Plaintiffs were taken by RJ and Shra to their home in Lanai City. SAIL MAUI attempted communication with Plaintiffs

intermittenely via phone and text, and arrangements were made for a return on the 5:30 p.m. ferry from Manele Bay Harbor to Lahaina Harbor. DOCARE Officer Alton Aoki met Plaintiffs at the Manele Bay ferry stop where they filled out a police report. The ferry arrived back at Lahaina Harbor at approximately 6:20 p.m. Plaintiffs were met at the harbor by Don Prestage, president of SAIL MAUI, and another employee. They returned Plaintiffs' belongings that had been left on the Vessel in a card board box. Plaintiffs have not had contact with Defendants since.

28. Plaintiffs remained in Maui until September 26, 2021 and returned home to California on September 26, 2021.

29. A Coast Guard investigation concluded that the vessel master negligently performed duties with regard to operating the vessel because he did not uphold the company safety procedures of ensuring a proper head count and verification of passengers was conducted prior to departing the snorkel site. The case was referred to enforcement. Upon information and belief, Defendants have since changed their roll call protocol and now make vocal contact with each listed passenger before departing.

## COUNT I

### NEGLIGENCE

30. Plaintiffs incorporate by reference and reallege as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

31. At all times relevant herein, Defendants owed Plaintiff a duty of reasonable care under the circumstances and a duty to protect Plaintiffs from unreasonable risk of physical and emotional harm.

32. At all times relevant herein Defendants breached this duty of care by failing to provide adequate safety instructions to Plaintiffs; by failing to identify the proper snorkel boundaries to Plaintiffs; by failing to instruct Plaintiffs on a clear return time to the Vessel; by failing to clearly identify to passengers who the in-water lifeguard would be; by failing to heed the statement of a passenger that other passengers (Plaintiffs) remained in the water further out; by failing to follow Defendants' own Snorkel Safety Procedure; by violating 46 C.F.R § 5.29 and other relevant statutes and regulations; by failing to have properly trained Captain and Crew; by failing to keep a proper lookout for passengers; by failing to conduct an adequate head count of passengers before departing both the snorkel site; by failing to respond to the Plaintiffs distress calls in a timely or reasonable manner; and by such further acts and ommissions on the part of Defendants as revealed through discovery. At all material times Defendants had actual or constructive notice of the above conditions and knew or should have known that the above conditions created an unreasonable risk of harm to Plaintiffs.

33. As a direct and proximate result of the Defendants' negligence as alleged above, Plaintiffs suffered and continue to suffer from physical pain and suffering, emotional distress, lost income and other special and general damages in amounts according to proof that are in excess of this Court's minimum jurisdiction.

## COUNT II

## GROSS NEGLIGENCE

34. Plaintiffs incorporate by reference and reallege as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

35. At all times relevant herein, Defendants's negligence as alleged herein was so wanton and reckless that it exceeds the bounds of ordinary negligence and was more than mere inadvertence, mistake or error of judgment, but was a callous disregard of safety procedures and practices designed to protect Plaintiffs from harm, which rises to the level of conscious wrongdoing.

36. As a direct and proximate result of the Defendants' gross negligence as alleged above, Plaintiffs should be awarded punitive damages against Defendants in accordance with applicable law.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

37. Plaintiffs incorporate by reference and realleges as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

38. In performing all of the acts described above, Defendants negligently inflicted severe emotional distress on Plaintiffs, and the conduct of Defendants was so outrageous as to offend and shock the conscious of a reasonable and prudent person. The emotional distress was accompanied by physical injuries to both Plaintiffs and their property. Each Plaintiff experienced their own emotional distress based on their own struggle in the open ocean and by witnessing and being in close proximity to their spouse's struggle in the ocean.

39. As a direct and proximate result of the Defendants negligent infliction of severe emotional distress, Plaintiff suffered special and general damages in amounts to be proven at trial.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

40. Plaintiffs incorporate by reference and realleges as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

41. Each of the grossly negligent acts alleged herein which caused harm to Plaintiffs was intentional and/or reckless, outrageous, and caused extreme emotional distress to both Plaintiffs. The emotional distress was accompanied by physical

injuries to both Plaintiffs and their property. Each Plaintiff experienced their own emotional distress based on their own struggle in the open ocean and by witnessing and being in close proximity to their spouse's struggle in the ocean.

42. As a direct and proximate result of the Defendants negligent infliction of severe emotional distress, Plaintiff suffered special and general damages in amounts to be proven at trial.

## COUNT V

### RESPONDEAT SUPERIOR

43. Plaintiffs incorporate by reference and realleges as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

44. At all material times herein, the negligent and intentional acts of Defendants' employees and/or agents alleged herein were committed within the course and scope of their employement with Defendants, and Defendants are therefore liable to Plaintiffs under the doctrine of respondeat superior.

## COUNT VI

## LOSS OF CONSORTIUM

45. Plaintiffs incorporate by reference and realleges as if fully set forth herein, the allegations contained in all preceding paragraphs herein.

46. At all times material herein Plaintiffs were lawfully married to each other; each spouse suffered a tortious injury and emotional distress on account of Defendants' negligence as alleged herein, and each spouse witnessed the other spouse's injury; both spouses experienced loss of consoritum from each other as a result of the incident alleged herein; and the loss of consoritum alleged herein was directly and proximately caused by the negligent and intentional acts of Defendants as alleged herein.

WHEREFORE, Plaintiffs WEBSTER and BURCKLE pray for judgment against Defendants, jointly and severally, as follows:

A. For general damages in an amount to be proven at trial in excess of $75,000;

B. For special damages in an amount to be proven in trial in excess of $75,000;

C. For consequential and incidental damages in an amount to be proven at trial;

C. For punitive damages in an amount to be proven at trial;

D. For attorneys' fees, costs of suit, prejudgment interest from the date of this incident, and such other and further relief, both legal and equitable, that this Court deems just and proper under the circumstances.

DATED: Honolulu, Hawaii, February 17, 2023

/s/Jared A. Washkowitz_____
JARED A. WASHKOWITZ
DOUGLAS T. MOORE
Attorneys for Plaintiffs
ELIZABETH WEBSTER and
ALEXANDER BURCKLE

## **DEMAND FOR JURY TRIAL**

Plaintiffs WEBSTER and BURCKLE , by and through their undersigned counsel, hereby demand a trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, Februry 17, 2023

/s/Jared A. Washkowitz_____
JARED A. WASHKOWITZ
DOUGLAS T. MOORE
Attorneys for Plaintiffs
ELIZABETH WEBSTER and
ALEXANDER BURCKLE